UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
BRITTANY LEGASEY                      )
      Plaintiff,                      )
                                      )   C.A. No. 15-40148-TSH
v.                                    )
                                      )
CITY OF WORCESTER and DAVID           )
RUSHFORD, in his individual and       )
official capacity as city clerk,      )
      Defendants.                     )
_____)
```

## DECISION AND ORDER ON DEFENDANTS MOTION FOR SUMMARY JUDGMENT
### (Doc. No. 51)

**August 31, 2018**

**HILLMAN, D.J.**

Brittany Legasey ("Plaintiff") brings this action against David Rushford ("Rushford"), individually and in his official capacity as city clerk, and the City of Worcester (the City") (collectively referred to as "Defendants") for her unlawful termination. She has asserts claims for violation of her civil rights under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12 § 11H-11J, as well as retaliation under Mass. Gen. Laws ch. 149, § 185. The Defendants filed this motion seeking summary judgment as to all counts.

### Background

The Plaintiff began working as a principal staff assistant ("PSA") for the Elections Office (the "Elections Office") within the City's Clerks Department ("Clerks Department") on September 15, 2014. The Elections Office is responsible for administering and overseeing all

elections in the City. There are fourteen budgeted positions in the Clerks Department, four of which are in the Elections Office. The city clerk is the head of the Elections Office and has the authority to hire and fire all persons employed within the Clerks Department. Rushford was city clerk from 1998 through 2016. During his tenure, Rushford terminated four employees, one for abandoning his position, two for stealing money, and Plaintiff. Nikolin Vangjeli ("Vangjeli"), the Plaintiff's direct supervisor was hired by Rushford in 2013 and was quickly promoted. Vangjeli had worked for Democratic Mayor Petty in the summer of 2012 and requested a recommendation from him for at least one of the promotional positions Vangjeli applied for, and received, within the Elections Office. Rushford also hired Shannon Emmons ("Emmons"), the cousin of Mayor Petty.

Plaintiff did not receive formal training but "on the fly" training in her position as PSA. On December 8, 2014, Plaintiff attended a human resources orientation with Pamela Callahan. During this orientation, Plaintiff was informed of the policies regarding sick time including that she must request permission to take time off.

Plaintiff overheard Rushford refer to a city councilor who had campaigned against Mayor Petty in 2011 and 2013, as a "bitch." She also heard him refer to a Republican State Committee member as "crazy" and a "bitch" and accused her of "perpetuating voter fraud and intimidation". While discussing his experience working on political campaigns with Plaintiff, Rushford referenced the employees of the Clerks Department as "all good democrats".

On December 6, 2014, Plaintiff, and her roommate Cindy Nguyen ("Nguyen"),[1] attended a birthday party for City Counselor Michael Gaffney ("Gaffney"). Within a few days after the

---

[1] Sometime after this event, Nguyen informed Plaintiff of her intent to run for city council the following fall. Plaintiff requested that she find alternate housing before announcing her candidacy due to her position as PSA for the City. Nguyen announced her candidacy for the fall of 2015 after moving out. It is undisputed that Plaintiff's living situation was not a violation of the conflict of interest laws.

2

party, Plaintiff informed Vangjeli that she had attended and had spoken with a Republican state committee member. Vangjeli does not remember speaking with Plaintiff about any concerns as to her attendance at the party at this time.

Gaffney announced his candidacy to run for mayor against Mayor Petty in 2015. Plaintiff asserts that at the time of the party she was not aware that it was a campaign fundraiser, was not asked to make a donation, and did not know that Nguyen donated. Public campaign contribution records shows that Gaffney received a significant amount of campaign contributions at this party.

On April 17, 2015, a potential candidate for city councilor submitted paperwork for nomination papers. Plaintiff, concerned about the potential candidate's eligibility based on residency, raised this issue with Vangjeli. In response, Vangjeli raised his voice at Plaintiff for questioning him about it.

On April 30, 2015 Rushford provided Plaintiff with a letter raising his concerns about her behavior and performance (the "Warning Letter"). In the Warning Letter, Rushford warned Plaintiff about issues with her attendance, failure to appropriately request time off, and unprofessional or insubordinate behavior towards Vangjeli, partly as a result of Plaintiff's concerns regarding the potential candidate's nomination papers. Additionally Plaintiff was warned of a potential violation of the conflict of interest law for her attendance at Gaffney's party, which Rushford characterized as a campaign event.[2] Lastly, Plaintiff was warned that her performance had not been up to par. Rushford pointed to Plaintiff's lack of attention to detail, failure to assist customers at the window, answer phones, and work in the operations room.

Plaintiff met with legal counsel and submitted a response to the Warning Letter on August 17, 2015 (the "Response Letter"). In the Response Letter, Plaintiff clarified what she

---

[2] There is no dispute that Plaintiff was aware that she was prohibited from engaging in campaign activities.

perceived to be inaccurate statements and allegations in the Warning Letter and raised questions about overtime pay, deductions of pay for time off, the process for requesting leave, the conflict of interest laws, and the candidacy registration process. She also requested that any concerns regarding her performance or conduct be raised with her immediately.

On September 1, 2015, Plaintiff emailed Rushford regarding Vangjeli's negative response concerning a poll worker training. Rushford did not respond to this email. Instead, the following day, Rushford called Plaintiff into his office and placed her on suspension for seven business days. Rushford gave Plaintiff a written letter outlining the reasons for her suspension (the "Suspension Letter"). The stated reasons included the following incidents, alleged to have occurred between May and August: (1) an improper mailing of a Worcester Voter Registration card to the town clerk of Bellingham; (2) failure to pay close attention to detail involving the processing of confirmation forms, as witnessed by Vangjeli; (3) entering inaccurate voter information into VRIS resulting in a voter being listed as 128 years old; (4) failure to comply with a request by the Secretary of State's Office that Plaintiff remedy the above inaccurate voter information, which resulted in the voter not being able to vote in the primary and; (5) failure to follow Vangjeli's directions to send letters to poll workers by using incomplete addresses and appointing two workers to the same position. Plaintiff was also informed that failure to return to work with an improved attitude and performance could result in further discipline, including termination.

Plaintiff denies receiving any reprimand from Vangjeli, and alleges that she was not aware of the improper mailing to the town of Bellingham or the improper mailings to poll workers. She further asserts that she was never asked to remedy the inaccurate voter registration but only to place an RMV request. Although the Suspension Letter stated that Plaintiff had

4

become "increasingly resistant to constructive criticism," Plaintiff asserts that she had not been spoken to about her performance during the time between the Warning Letter and the Suspension Letter.

Plaintiff returned to work on September 14, 2014 and met with Rushford, Pamela Callahan, and Defendants counsel, William Bagdley, Jr. (the "Meeting"). At some point during the Meeting, Rushford became angry, asked if Plaintiff could be suspended until after the November election, and left. Plaintiff states that Callahan and Bagdley encouraged Plaintiff to apologize to Rushford. After the Meeting, Plaintiff was sent home on administrative leave for the remainder of the day. She returned to work the following day and was assigned tasks in the basement of City Hall.

In October, Plaintiff mailed 300 copies of notices to poll workers for the 2015 election providing an incorrect date for the deadline. Additionally, 200 of these notices required inspectors to arrive at their designated poll locations at the wrong time. Plaintiff had mail merged these notices and sent a final product to Vangjeli and Emmons for review prior to mailing them. Vangjeli did not reply and Emmons stated they looked fine. As a result of this error, Plaintiff was terminated on October 15, 2015. She was provided a termination letter signed by the city manager.[3] It does not appear that Vangjeli or Emmons were disciplined for any involvement in these notices being mailed.

**Standard**

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when the evidence is such that it would permit

---

[3] According to Rushford, the city manager's authorization to terminate Plaintiff was not required but it is standard protocol to have the city manager sign the document.

5

a reasonable factfinder to find in favor of either party with regards to that particular point. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit under the applicable law. *Id.* It is the burden of the moving party to establish the lack of genuine issues of material facts, entitling them to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). This burden can be made by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325). The court must look to "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in the party's favor". *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995).

## § 1983 (Count I)

To survive a motion for summary judgment on a patronage termination claim, the plaintiff must first show that her "conduct was constitutionally protected, and that this conduct was a substantial factor or…that it was a motivating factor" in her termination. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)(internal quotation marks omitted). Upon this showing, the defendant then has the opportunity to show "by a preponderance of the evidence that it would have reached the same decision as to [terminate] even in the absence of the protected conduct." *Id*.

### *Constitutionally Protected Conduct*

"It is well-established that 'non-policymaking public employees are protected from adverse employment decisions based on their political affiliation.'" *Barry v. Moran*, 661 F.3d 696, 703 (1st Cir. 2011)(quoting *Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 74 (1st Cir.

6

2000)(citations omitted)). However, there is an exception when "political affiliation is an 'appropriate requirement for the effective performance of the public office involved.'" *Galloza v. Foy*, 389 FF.2d 26, 28 (1st Cir. 2004)(quoting *Branti v. Finkel*, 445 U.S.. 507, 518, 100 S. Ct. 1287 (1980). To determine whether discharge based on political affiliation is permissible, the employer must show that it is their function to make decisions "on issues where there is room for political disagreement on goals or their implementation" and that the responsibilities of the terminated employee's position are similar to those of "a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Roldan-Plumey v. Cerezo-Suarez*, 115 F.3d 58, 61-62 (1st Cir. 1997)(quotations and citations omitted).

The Defendants argue that to the extent Plaintiff was terminated because of her political affiliation, such termination was permissible. It is Defendants assertion that because Plaintiff's responsibilities as PSA were to maintain the integrity of the elections process, she had to refrain from engaging in any political activities, regardless of the political party. Defendants further assert that because Plaintiff's conduct created, at a minimum, the perception that she was affiliated with a political party, she could not effectively perform her duties in the Elections Office. *See* Doc. No. 52; p. 25 ("[t]o operate efficiently, the Elections [Office] must present to candidates and voters of all parties the appearance of an unbiased operation. Where bias is suspected, voters and candidates for office will lose faith in the Office's ability to accurately and timely enter critical information."). Simply put, Defendants argue that it is an appropriate requirement of the PSA position that she refrain from any political affiliation and therefore termination as result of political affiliation is permitted. In contrast, Plaintiff argues that because

7

political affiliation was *prohibited* in order for her to adequately perform her job, then it cannot follow that political affiliation was *required* in order for her to perform. I agree.

The Plaintiff was not employed in a position similar to that of a policy maker whose function appropriately required that she have political loyalty. In addition to maintaining the integrity of the elections process, Plaintiff's duties included administrative tasks such as assisting at the window, answering telephones, processing nomination papers, and mailing correspondence to registered voters. It was her responsibility to assist all residents and she was not permitted to promote one political party over another.[4] Her duties clearly did not include making policy decisions and she did not have an influence over policy implementation. Therefore, the general rule prohibiting political discharge based on political affiliation applies and the Plaintiff must show her political affiliation was a substantial or motivating factor in her termination.

*Substantial or Motivating Factor*

The Defendants argue that Plaintiff was not terminated for any political affiliation but for a pattern of poor performance jeopardizing voters' rights and the functions of the Elections Office. While the record shows that Plaintiff made errors during her employment as PSA, it also provides sufficient circumstantial evidence to support a reasonable inference that Plaintiff's termination was substantially related to or motivated by her political affiliation. *See Barry v. Moran*, 661 F.3d 696, 705 (1st Cir. 2011)("[W]e have held, time and time again, that circumstantial evidence alone can support a finding of political discrimination.")(quoting *Anthony v. Sundlun*, 952 F.2d 603, 705 (1st Cir. 1991)).

---

[4] It is important to note that the Defendants do not argue that Plaintiff was terminated for a violation of their policies as a result of her attendance at the Gaffney party nor does the Plaintiff argue that she was terminated specifically for her attendance but for her affiliation with Gaffney and/or the Republican Party.

In addition to the warning against attending campaign events, which in it of itself does not appear to be improper, the record shows that Rushford made a comment about his employees being "good democrats" and did not bring his concerns about Plaintiff's poor performance until April, months after some of the complained of conduct occurred. For example, Vangjeli testified that he was aware of and informed Rushford of Plaintiff's attendance at Gaffney's party shortly after it happened. However, concerns regarding her attendance were not raised until after Gaffney announced his candidacy for mayor. Similarly, Rushford did not immediately address concerns about Plaintiff's performance after the Warning Letter but waited until closer to the November 2015 election to suspend her for conduct, some of which occurred months earlier. Rushford also specifically requested that Plaintiff be prohibited from working until after the 2015 election. It is important to note that Plaintiff did not receive formal training in her position as PSA and it appears to be counterproductive not to address performance concerns as they arise in a work place with "on the job" training. The Court also notes that Rushford did not discipline Vangjeli or Emmons for their alleged involvement in the critical error for which Plaintiff was terminated. Lastly, the record shows that during Rushford's decades of serving as city clerk, the only employee he terminated for performance issues was Plaintiff.

In light of all of these facts, I find there is a reasonable inference that Plaintiff's termination was improperly motived by her political affiliation. To the extent that the Defendants argue that Plaintiff would have been (and in fact was) terminated because of her inadequate performance, I find this to be an issue of material fact. *See Barry*, 661 F.3d at 705 (a plaintiff "may escape summary judgment only by 'pointing to evidence in the record which, if credited, would permit a rational fact finder to conclude that the challenged personnel action

9

occurred and stemmed from a politically based discriminatory animus.'")(quoting *LaRou v. Ridlon*, 98 F.3d 659, 661 (citation omitted)).

*Municipal Liability*

A municipality "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, or regulation, or decision officially adopted and promulgated by that body's officers. *Monell v. New York City Dep't of Social Serv*., 436 U.S. 658, 690, 98 S. Ct. 2018, 2035-36 (1978). A plaintiff cannot establish municipal liability based on a theory of respondeat superior but "only when an injury was inflicted by a government's 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22, 108 S. Ct. 915, 923 (1988)(quoting *Monell*, 436 U.S. at 694). "[U]nconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id*. at 123. The official must have "final policymaking authority", a determination of which is state law, and "the challenged action must have been taken pursuant to a policy adopted by the official…responsible under state law for making policy *in that area* of the city's business." *Id*. (emphasis in original).

The City Charter, which exempts the city clerk from falling under the authority of the city manager, and Rushford's testimony that he had the final authority to make hiring and firing decisions shows that he was in a position of final policymaking as to the hiring and firing of employees within the Clerks Department. As discussed above, the record supports a reasonable inference that Rushford made hiring and firing decisions based on party affiliation. Specifically, that he terminated Plaintiff because of her affiliations with Gaffney and/or the Republican Party.

Additionally, the record shows that Rushford hired Vangjeli and Emmons, both of whom have been affiliated with Mayor Petty, quickly promoted Vangjeli, and did not discipline either of them for their involvement in the critical error that Plaintiff was allegedly terminated for. For purposes of this motion, I find that the Plaintiff has established the existence of an unconstitutional municipal policy.[5]

*Qualified Immunity*

Qualified immunity shields government employees conducting discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537(1991)(internal quotation omitted). For qualified immunity to apply, the court must find that "the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and…the right at issue was clearly established at the time of the defendant's alleged misconduct." *Lucia v. City of Peabody*, 971 F. Supp. 153, 164 (D. Mass. 2013)(citing *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)). To determine if the right was clearly established the court should consider "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Id*. (quoting *Mlodzinski v. Lewis*, 648 F.2d 24, 33 (1st Cir. 2011)). It is no longer required that the court analyze the application of qualified immunity in a particular order. *Maldonado*, 568 F.3d at 270.

---

[5] The Defendants failed to articulate a valid legal argument as to why no municipal liability should attach in this case.

For the reasons discussed above, the record sufficiently shows that Rushford violated Plaintiff's First Amendment rights by terminating her based on her political affiliation and the Court turns to whether, at the time of Plaintiff's termination, it was clearly established that termination based on her political affiliation was not permissible.

"[W]e look only to the inherent duties of a position and ask whether the defendant could reasonably believe the position in question was one 'that appropriately required political affiliation.'" *Roldan-Plumey*, 115 F.3d at 66. "The ultimate question…[is] whether [the defendant's] disciplinary action against the plaintiffs is entitled to immunity from liability even if that action violated plaintiffs' First Amendment rights." *Jordan v. Carter*, 428 F.3d 67, 71 (1st Cir. 2005). Here, it was unreasonable for the Defendant to believe that terminating Plaintiff based on her political affiliation was consistent with her First Amendment rights. As discussed above, it is clearly established that non-policymaking employees are protected from termination based on their political affiliation and that Plaintiff was not employed in a policy making position. Therefore, Rushford is not entitled to qualified immunity.[6]

### MCRA (Count II)

The Massachusetts Civil Rights Act, (the "MCRA"), Mass. Gen. Laws ch. 12 § 11H and 11I, is the state analog to § 1983. To survive a motion for summary judgment, there must be evidence that the official threatened, intimidated, or coerced the plaintiff with the intent to prevent him from exercising a constitutional right. *Acciavatti v. Prof'l Servs. Grp., Inc.*, 982 F. Supp. 69, 78 (D. Mass. 1997). "[R]etaliatory behavior," such as terminating Plaintiff for exercising her rights, "constitutes the requisite 'intimidation, threat, or coercion' under the

---

[6] The Court notes that in Defendants supplemental brief discussing qualified immunity, the Defendant argues that the evidence does not show that Rushford reasonably believed that his conduct violated any constitutional rights. This is not the appropriate standard to analyze qualified immunity. Additionally, to the extent that this argument relies on the determination that Rushford believed that termination was appropriate based on Plaintiff's failure to remain politically neutral, I find such a determination to be a question of fact.

MCRA." *Id*. at 79; *See Broderick v. Roache*, 803 F. Supp. 480 (D. Mass. 1992)( "a scheme of harassment arising from the exercise of secured rights also violates the MCRA"). For the reasons discussed above, Defendants motion for summary judgment as to Count II is denied.

## Whistleblower (Count III)

Mass. Gen. Laws ch. 149, § 185 prohibits public employer's from retaliating against an employee who engages in protected activity. *See Bennett v. Holyoke*, 362 F.3d 1, 5 (1st Cir. 2004). Protected activity includes disclosing or threatening to disclose information to a supervisor or public body as well as objecting or refusing to participate in "any activity, policy or practice which the employee believes poses a risk to public health [or] safety." *Id*. A retaliatory action is considered any "discharge, suspension, demotion, or any other action that adversely affects the terms and conditions of the employment." *Id*. A whistleblower claim may not succeed unless the employee brought the complained of practice "to the attention of a supervisor or public body…by written notice and afforded the employer a reasonable opportunity to correct the activity." Mass. Gen, Law ch. 149 § 185(c)(1).[7]

The Defendants argue that Plaintiff failed to provide written notice as required by the statute. It is Defendants assertion that the Response Letter did not comply with the written notice requirement because Plaintiff merely requested clarification as to sick leave and improper salary reductions, and because the asserted illegal candidate registration was not illegal. Additionally, Defendants argue that even assuming that the Response Letter did comply with the notice requirement, Plaintiff was not terminated for raising these issues but because of poor performance.

The purpose of the written notice requirement is "to give the employer unequivocal notice (*i.e*., in writing) and an opportunity to clean up its own house before the matter [is] taken

---

[7] There are exceptions to this rule however, none apply in this case and the Court declines to discuss them.

outside*.*" *Dirrane v. Brookline Police Dept.*, 315 F.3d 65, 73 (1st Cir. 2002). I agree with Plaintiff's argument that to require the written notice be stated in an accusatory manner would be inconsistent with its purpose because it could create increased hostility in the workplace and minimize efforts of addressing the issue amicably "in house. At a minimum, the raising of questions as to the ongoing practices in the Elections Office as stated in the Response Letter and whether they constitute an objection or disclosure is a question for the factfinder.

Additionally, the record shows that Plaintiff was not disciplined for attendance or insubordination after receiving the Warning Letter showing that her conduct had improved at least as to those issues. Moreover, the timeline shows that Plaintiff was not disciplined for any new performance issues, at least one of which occurred as early as May 1, 2015, until after she submitted the Response Letter. Plaintiff also denies some of the performance errors she was accused of in the Suspension letter. Therefore, I find that the record raises a genuine issue of fact as to whether Plaintiff's termination was a result of her inadequate performance or improper retaliation.

Lastly, the Defendants argue that the complained of conduct was not a violation of law or policy because persons are allowed to *apply* to run for office even if they may not meet the required residency requirement. However, it was reasonable for Plaintiff to believe that such conduct was illegal regardless of the actual legality of it. *See Larch v. Mansfield Mun. Elec. Dep't*, 272 F.3d 63, 69 n. 5 (1st Cir. 2001); *see also Mailloux v. Town Of Littleton*, 473 F. Supp. 2d 177, 199 (D. Mass. 2011) (the court denied summary judgment on whistleblower statute claim because even if no § 1983 violation occurred, a jury could find that Plaintiff reasonably believed the defendants order was illegal).

**Conclusion**

For all of the reasons stated above, the Defendants Motion for Summary Judgment (Doc. No. 51) is ***denied***.[8]

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

---

[8] To the extent that Plaintiff sues the City and Rushford, in his official capacity, the claim against him in his official capacity is dismissed as duplicative of the claim against the City. *See Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099, 3105 (1985) (official-capacity suits "generally represent only another way of pleading an action against the entity of which the officer is an agent…as long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (quotations and citations omitted)).